UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TODD TAYLOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:14CV1245 ACL |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

Plaintiff Todd Taylor brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration ("SSA") Commissioner's decision, following continuing disability review ("CDR"), finding that he was no longer entitled to previously-granted disability insurance benefits under Title II of the Social Security Act. This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

## I. Procedural History

On December 23, 2009, Taylor was found disabled beginning January 31, 2007, under the application for Title II disability insurance benefits that he protectively filed on October 14, 2008. (Tr. 68-71.) The administrative law judge ("ALJ") found that Taylor's degenerative disc disease of the lumbar spine met the criteria of listing 1.04A and that Taylor was therefore disabled. (Tr. 70.) The ALJ noted that medical improvement was "expected with appropriate treatment." (Tr. 71.) Consequently, the ALJ recommended a continuing disability review in twelve months. *Id.*

On October 15, 2011, the SSA reviewed Taylor's claim for continuing disability, and concluded that Taylor was no longer disabled as of that date because work-related medical improvement had occurred. (Tr. 72, 74.) Taylor's period of disability terminated on December 31, 2011. (Tr. 74.) Taylor appealed the termination of benefits, and the termination was affirmed upon reconsideration. (Tr. 88-96.) On November 19, 2012, following a hearing, an ALJ found that Taylor was no longer disabled as of December 31, 2011. (Tr. 23-31.) On May 12, 2014, the Appeals Council denied Taylor's request for review of the ALJ's decision. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981.

In the instant action, Taylor first claims that the ALJ erred when he failed to "properly apply the 'medical improvement' standard prior to concluding that 'there has been improvement' in the claimant's medical condition and that the tests did not show a worsening." (Doc. 13 at 5.) Taylor next argues that the ALJ erred by failing to "comply with 20 C.F.R. § 404.1527 by failing to accord adequate weight to the opinion of the claimant's treating physician." *Id.*

## II. Statutory Framework and Standard of Review

Once an individual becomes entitled to disability and SSI benefits, his continued entitlement to benefits must be reviewed periodically. 42 U.S.C. § 423(f)(1); 20 C.F.R. § 416.949(a). If there has been medical improvement related to the claimant's ability to work, and the claimant is able to engage in substantial gainful activity, then a finding of not disabled will be appropriate. *Id.; Nelson v. Sullivan*, 946 F.2d 1314, 1315 (8th Cir. 1991). The "medical improvement" standard requires the Commissioner to compare a claimant's current condition with

the condition existing at the time the claimant was found disabled and awarded benefits. *Delph v. Astrue*, 538 F.3d 940, 945-46 (8th Cir. 2008), *cert. denied*, 129 S. Ct. 1999 (2009)).

The Eighth Circuit has articulated the burden in this type of case as follows:

> The claimant in a disability benefits case has a 'continuing burden' to demonstrate that he is disabled, *Mathews v. Eldridge*, 424 U.S. 319, 336, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), and no inference is to be drawn from the fact that the individual has previously been granted benefits. 42 U.S.C. § 423(f). Once the claimant meets this initial responsibility, however, the burden shifts to the Secretary to demonstrate that the claimant is not disabled. *Lewis v. Heckler*, 808 F.2d 1293, 1297 (8th Cir. 1987). If the Government wishes to cut off benefits due to an improvement in the claimant's medical condition, it must demonstrate that the conditions which previously rendered the claimant disabled have ameliorated, and that the improvement in the physical condition is related to claimant's ability to work. 20 C.F.R. § 404.1594(b)(2)-(5).

*Nelson*, 946 F.2d at 1315-16.

The CDR process involves a sequential analysis prescribed in 20 C.F.R. § 404.1594(f), pursuant to which the Commissioner must determine the following:

> (1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there has been a medical improvement, (4) if there has been a medical improvement, whether it is related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity, and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

*Delph*, 538 F.3d at 945-46.

The regulations define medical improvement as:

> [A]ny decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in

medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s).

20 C.F.R. § 416.994(b)(1)(I). Medical improvement can be found in cases involving the improvement of a single impairment if that improvement increases the claimant's overall ability to perform work related functions. *Id.* § 416.994(c)(2).

Medical improvement is related to the claimant's ability to work if an impairment improved to the extent that it no longer meets a listing. *See* 20 C.F.R. § 404.1594(c)(3)(i) ("If medical improvement has occurred and the severity of the prior impairment(s) no longer meets or equals the same listing section used to make our most recent favorable decision, we will find that the medical improvement was related to your ability to work").

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's findings are supported by substantial evidence. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" *Cruse v. Chater*, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record *de novo*. *Id.* at 1328 (citing *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *Id.* at 1320; *Clark v. Chater*, 75 F.3d 414, 416-17 (8th Cir. 1996).

### III. The ALJ's Determination

The ALJ made the following findings:

1. The most recent favorable medical decision finding that the claimant was disabled is the decision dated December 23, 2009. This is known as the "comparison point decision"

or CPD.

2. At the time of the CPD, the claimant had the following medically determinable impairments: degenerative disc disease of the lumbar spine. This impairment was found to result in meeting listing 1.04.

3. Through December 31, 2011, the date the claimant's disability ended, the claimant did not engage in substantial gainful activity (20 CFR 404.1594(f)(1)).

4. The medical evidence establishes that, as of December 31, 2011, the claimant had the following medically determinable impairment: degenerative disc disease of the lumbar spine.

5. Since December 31, 2011, the claimant did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

6. Medical improvement occurred as of December 31, 2011 (20 CFR 404.1594(b)(1)).

7. As of December 31, 2011, the impairments present at the time of the CPD had decreased in medical severity to the point where the claimant had the residual functional capacity to lift up to 20 pounds occasionally, sit for seven hours out of an eight-hour work day, and stand or walk for one hour out of an eight-hour work day. The claimant is unable to climb ladders, ropes, or scaffolds, as well as kneel, crouch or crawl. The claimant can occasionally climb ramps or stairs and can occasionally stoop. The claimant is unable to operate foot control operations. The claimant must avoid all exposure to extreme vibration, operational control of moving machinery, working at unprotected heights, and the use of hazardous machinery.

8. The claimant's medical improvement is related to the ability to work because it resulted in an increase in the claimant's residual functional capacity (20 CFR 404.1594(c)(3)(ii)).

9. As of December 31, 2011, the claimant was unable to perform past relevant work (20 CFR 404.1565).

10. On December 31, 2011, the claimant was a younger individual age 18-49 (20 CFR 404.1563).

11. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

12. Beginning on December 31, 2011, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job sills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

13. As of December 31, 2011, considering the claimant's age, education, work experience, and residual functional capacity based on the impairments present as of December 31, 2011, the claimant was able to perform a significant number of jobs in the national economy (20 CFR 404.1560(c) and 404.1566).

14. The claimant's disability ended as of December 31, 2011 (20 CFR 404.1594(f)(8)).

(Tr. 25-31).

The ALJ's final decision reads as follows:

The claimant's disability under sections 216(i) and 223(f) of the Social Security Act ended as of December 31, 2011.

(Tr. 31.)

## IV. Discussion

As noted above, Taylor raises two claims in this action for judicial review of the ALJ's decision terminating benefits. The undersigned will discuss Taylor's claims in turn.

### IV.A. Medical Improvement Determination

Taylor first argues that the ALJ committed reversible error in failing to properly apply the "medical improvement" standard prior to summarily concluding that "there has been improvement" in Taylor's medical condition. Defendant contends that the ALJ properly concluded that Taylor's degenerative disc disease had medically improved related to the ability to work.

Taylor was found disabled in the comparison point decision issued on December 23, 2009, because his degenerative disc disease met listing 1.04A. (Tr. 70-71.) Listing 1.04 provides:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or

>reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)
>B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 1.04. The ALJ in the comparison point decision found that Taylor's lumbar spine impairments, including spinal stenosis,[1] nerve root compression and impingent of the thecal sac at L4-5, meet the criteria of Section 1.04A. (Tr. 70.) The ALJ noted that an MRI revealed broad posterior and left lateral herniated disk at L4-5 compressing the thecal sac in the L5 nerve root, as well as retrolisthesis[2] from L4 to L5 and spondylolisthesis[3] of L5 on S1. *Id.*

The ALJ in the instant case found that Taylor's degenerative disc disease of the lumbar spine no longer met Listing 1.04 as of December 31, 2011, because there was no evidence of nerve root compression, spinal arachnoiditis, or pseudo-claudication of the lumbar spine that results in an inability to ambulate effectively. (Tr. 26.) The medical evidence supports this finding.

The ALJ noted that Taylor underwent a laminectomy[4] and fusion surgery at L4-5 and L5-S in October of 2009, performed by Jacob Buchowski, M.D., due to a diagnosis of spondylolisthesis

---

[1]Narrowing of the spinal canal. *Stedman's Medical Dictionary*, 1832 (28th Ed. 2006).
[2]Retrolisthesis is "backwards slippage of one vertebral body on another." There is "a possible association between retrolisthesis and increased back pain and impaired back function." Michael Shen et al., *Retrolisthesis and Lumbar Disc Herniation: A Pre-Operative Assessment of Patient Function*, 7 SPINE J. 406 (2007), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2278018/.
[3]Forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or on the sacrum. *Stedman's* at 1813.
[4]Excision of a vertebral lamina. *Stedman's* at 1046.

and herniated nucleus pulposus[5] at L4-5. (Tr. 26, 428-29.) At his first post-operative visit in November 2009, Taylor reported that his back pain and bilateral lower extremity symptoms had greatly improved. (Tr. 409.) Taylor indicated that he could not believe how well he was doing. *Id.* Taylor used a cane, but Dr. Buchowski indicated that it was more for "moral support than anything else." *Id.* Upon examination, Taylor had normal strength and sensation. (Tr. 409.) In February 2010, Taylor reported that he had been doing well until approximately three weeks earlier when he fell off of a porch and started experiencing persistent low back pain with radiation into his right lower extremity. (Tr. 247.) Upon examination, Taylor had a well-healed incision, normal motor strength throughout the lower extremities, normal sensation, and normal reflexes. *Id.* X-rays revealed that his spinal implants were in good position and there was no evidence of implant loosening or failure. *Id.* Taylor underwent a lumbar myelogram and post-myelogram CT scan later that month. (Tr. 253.) On March 8, 2010, Dr. Buchowski noted that the CT myelogram showed no evidence of neural compression and that all implants looked good. (Tr. 249.) Dr. Buchowski stated that it was "difficult to explain his symptoms." *Id.* Taylor returned for follow-up on January 3, 2012, at which time he reported that he had "done well" since his surgery, and that his lower extremity radicular symptoms and low back pain had resolved. (Tr. 407.) Taylor reported that the reason for his visit was that he had developed thoracic back pain. *Id.* On physical examination, Dr. Buchowski noted normal motor strength throughout the lower extremities, intact sensation, normal and symmetric reflexes throughout the lower extremities, negative straight leg raise test, and no significant tenderness to palpation over his thoracic spine. *Id.* Radiographs Taylor underwent that day revealed a solid fusion. *Id.* The ALJ found that Dr. Buchowski's treatment records were not consistent with Taylor's allegation

---

[5]The nucleus pulposus is the soft fibrocartilage central portion of the intervertebral disc. *Stedman's* at 1343.

that his impairments had worsened or that he had ongoing symptoms relating to his spinal impairments following surgery. (Tr. 26.)

The ALJ next stated that the objective medical records after Taylor's surgery do not support the presence of significant spinal impairments. *Id.* Taylor's February 2010 CT myelogram revealed grade 2 anterolisthesis[6] of L5 on S1, but no significant neural foraminal or spinal canal narrowing. (Tr. 27, 253.) Taylor also underwent a nerve conduction study on March 30, 2010, which revealed evidence of chronic neurogenic[7] changes in L4/S1 distribution on the right which could represent chronic right L4/L1 lumbar radiculopathy.[8] (Tr. 296.)

The ALJ noted that Taylor also saw family physician Aubra Houchin, D.O., for treatment of his back pain following his surgery. (Tr. 27.) On February 16, 2010, Taylor reported experiencing pain in his back and down his leg after slipping and falling on ice two weeks prior. (Tr. 278.) Upon examination, Dr. Houchin noted that Taylor was not acutely ill and moved "pretty good." *Id.* Taylor had no gross motor deficit, and a slightly labored gait. *Id.* Dr. Houchin prescribed Vicodin[9] for Taylor's back pain. *Id.* On March 11, 2010, Taylor complained of back pain, fecal incontinence, and radiculopathy. (Tr. 275.) Taylor's physical examination was normal, other than Taylor appeared in pain and was agitated, with rapid speech. (Tr. 276.) Dr. Houchin noted mild weakness in the right quad on extension. *Id.* Dr. Houchin increased Taylor's Vicodin, started him on Gabapentin,[10] and ordered a bone scan. (Tr. 277.)

---

[6]Grade II anterolisthesis is 26 to 50 percent forward slippage of one vertebral body on another. NCBI, *Bone Disorders of the Spine*, http://www.ncbi.nlm.nih.gov/books/NBK27236/ (last visited September 18, 2015).
[7]Originating in, starting from, or caused by, the nervous system or nerve impulses. *Stedman's* at 1310.
[8]Disorder of the spinal nerve roots. *Stedman's* at 1622.
[9]Vicodin is indicated for the relief of moderate to moderately severe pain. *Physician's Desk Reference (PDR)*, 529 (63rd Ed. 2009).

[10]Gabapentin is indicated for the treatment of nerve pain. *See* WebMD,

Communication from Dr. Houchin's office reveals that Taylor did not undergo the bone scan, but called Dr. Houchin for pain medication refills on several occasions. (Tr. 271-76.) Taylor presented on February 23, 2011, with complaints of ringing in his ears and thyroid issues. (Tr. 269.) He admitted to "using a lot of Vicodin and alcohol to deal with general stress issues and some chronic low back pain," but had been off of Vicodin for 87 days. *Id.* Taylor's musculoskeletal examination was normal, and no gross neurologic deficits were noted. *Id.* Dr. Houchin diagnosed Taylor with hypothyroidism and tinnitus. (Tr. 270.) Taylor returned for follow-up regarding hypothyroid on December 5, 2011, at which time he reported involuntary stool leakage since having back surgery. (Tr. 333.) Taylor reported that his chronic back pain was better since his fusion, although he now experienced intermittent burning pains in his low and mid back. *Id.* Upon examination, Taylor had a normal gait and station; no misalignment, asymmetry, crepitation, or defects; and no focal, motor, or cranial nerve deficit. (Tr. 334.) Dr. Houchin prescribed Neurontin for Taylor's back pain. (Tr. 335.) The ALJ found that Dr. Houchin's records do not support Taylor's complaints of disabling orthopedic impairments. (Tr. 27.)

The ALJ next discussed the records of Sandra Tate, M.D. (Tr. 27.) Taylor saw Dr. Tate, an orthopedist, on September 8, 2010, for an independent medical examination. (Tr. 305-07.) Taylor reported that his lower back symptoms were improved for a while following surgery, but he is currently having pain higher up, above the operative site. (Tr. 305.) Taylor also reported difficulties with bowel incontinence since his surgery, although Dr. Tate noted that the record showed that he first reported this to his physician in March of 2010, after he had fallen. *Id.* Dr. Tate noted that Taylor's February 2010 myelogram was unremarkable. *Id.* Upon examination,

---

http://www.webmd.com/drugs (last visited September 18, 2015).

Dr. Tate noted paravertebral tenderness but no muscle spasm; a slight decrease in range of motion of the lumbosacral spine; 4/5 strength in the upper and lower extremities; and negative straight-leg raising. (Tr. 306.) Dr. Tate stated that Taylor's symptoms of incontinence and increasing back pain seemed to occur after he fell following his lumbar fusion. *Id.*

The ALJ also discussed the questionnaire completed by Dr. Buchowski on July 7, 2011. (Tr. 27.) Dr. Buchowski completed a form, in which he indicated that Taylor has the diagnosis of isthmic[11] spondylolisthesis at L5-S1 and degenerative disc disease at L4-5 and L5-S1. (Tr. 301.) Dr. Buchowski stated that Taylor has limited range of motion, may have occasional muscle spasms, but is not required to ambulate with assistance. *Id.* Dr. Buchowski expressed the opinion that Taylor was unable to stand, walk, or sit for "extended periods of time." *Id.* The ALJ found that the other medical records are only somewhat consistent with and supportive of Dr. Buchowski's opinion. (Tr. 27.) The ALJ stated that even Dr. Buchowski's limitations, however, underscore that Taylor's impairments have medically improved since the comparison point date. *Id.*

Finally, the ALJ discussed notes from physical therapist Caitlin Weindel. (Tr. 28.) Ms. Weindel saw Taylor for an assessment on January 26, 2012, at which time he reported mid-back pain that had been worsening since his surgery. (Tr. 413.) He denied any numbness or tingling in the lower extremities since surgery. *Id.* Ms. Weindel noted tenderness to palpation in the thoracic spine. *Id.* She stated that Taylor tolerated treatment well, and his pain was slightly decreased after his session. *Id.* On February 21, 2012, Ms. Weindel indicated that Taylor had attended physical therapy for one month, and his mid and upper back pain was significantly improved. (Tr. 412.) Ms. Weindel stated that Taylor's cervical spine range of motion was

---

[11] Anatomical. *Stedman's* at 1007.

within normal limits, and tenderness to palpation was noted in the lower lumbar spine to the left of L5.  *Id.*  Ms. Weindel indicated that Taylor has been able to perform his daily activities without problems.  *Id.*

The medical evidence discussed above supports the ALJ's determination that Taylor's degenerative disc disease no longer met listing 1.04A as of December 31, 2011, and that medical improvement occurred, because there was no evidence of nerve root compression.  Taylor reported improvement in his lower back pain to Dr. Buchowski beginning on his first post-operative visit in November 2009.  (Tr. 409.)  Taylor reported to Dr. Houchin in December 2011 that his low back pain was better following his fusion (Tr. 33) and made the same report to Dr. Tate in September 2010 (Tr. 305).  Physical examinations following Taylor's surgery performed by Drs. Buchowski and Houchin revealed a well-healed incision, normal motor strength throughout the lower extremities, normal sensation, and normal reflexes.  (Tr. 409, 247, 278, 276, 269, 334).  Dr. Tate noted only paravertebral tenderness and a slight decrease in range of motion of the lumbosacral spine, with 4/5 strength in the upper and lower extremities, at her September 2010 examination.  (Tr. 306.)  Taylor's February 2010 CT myelogram revealed no significant neural foraminal or spinal canal narrowing.  (Tr. 253.)  It is true, as Taylor notes, that a nerve conduction study he underwent on March 3, 2010 revealed evidence of chronic neurogenic changes in L4/S1 distribution on the right.  (Tr. 296.)  It was noted that this *could* represent chronic right L4/S1 lumbar radiculopathy.  (Tr. 296.) (emphasis added).  No definite evidence of radiculopathy, however, was ever found.  Instead, on January 3, 2012, Taylor reported to Dr. Buchowski that his lower extremity radicular symptoms and low back pain had resolved.  (Tr. 407.)

The medical evidence does reveal complaints of thoracic back pain, beginning around

February 2010.  (Tr. 247.)  At that time, Dr. Buchowski noted no significant tenderness to palpation over his thoracic spine.  (Tr. 407.)  Similarly, Dr. Houchin noted that Taylor moved "pretty good," and had no gross motor deficit despite his complaints of thoracic back pain in February 2010.  (Tr. 278.)  Dr. Houchin indicated that Taylor's musculoskeletal examination was normal in February 2011 (Tr. 269), and again in December 2011 (Tr. 334).  Taylor underwent x-rays of the thoracic spine on January 3, 2012, which revealed only "minimal thoracic spine levocurvature."  (Tr. 419.)  Taylor attended physical therapy for his thoracic back pain.  The treatment notes of physical therapist Ms. Weindel revealed that Taylor's thoracic pain was "significantly improved" with physical therapy, and that Taylor was able to perform his daily activities without problems.  (Tr. 412.)  Thus, Taylor's complaints of thoracic back pain do not detract from the ALJ's finding that Taylor experienced medical improvement in his degenerative disc disease such that he no longer met Listing 1.04A.

Taylor argues that he did not experience medical improvement because his case is similar to Example 1 of 20 C.F.R. § 1594(b)(1).  Example 1 provides as follows:

> You were awarded disability benefits due to a herniated nucleus pulposus.  At the time of our prior decision granting you benefits you had had a laminectomy.  Postoperatively, a myelogram still shows evidence of a persistent deficit in your lumbar spine.  You had pain in your back, and pain and a burning sensation in your right foot and leg.  There were no muscle weakness or neurological changes and a modest decrease in motion in your back and leg.  When we reviewed your claim your treating physician reported that he had seen you regularly every 2 to 3 months for the past 2 years.  No further myelograms had been done, complaints of pain in the back and right leg continued especially on sitting or standing for more than a short period of time.  Your doctor further reported a moderately decreased range of motion in your back and right leg, but again no muscle atrophy or neurological changes were reported.  Medical improvement has not occurred because there has been no decrease in the severity of your back impairment as shown by changes in symptoms, signs or laboratory findings.

Here, unlike the hypothetical claimant in Example 1, Taylor's myelogram did not show evidence of a persistent deficit in the lumbar spine following surgery.  Rather, Taylor's February

2010 myelogram revealed no evidence of neural compression or neural, foraminal, or spinal narrowing. (Tr. 253.) In addition, Taylor's treating surgeon did not report that he had a moderately decreased range of motion in his back or right leg but, instead, reported that he had normal strength and reflexes and negative straight-leg raising. (Tr. 409, 247). Dr. Burchowski indicated that Taylor's myelogram showed no evidence of neural compression, and all of his implants looked good. (Tr. 249.) He stated that it was "difficult to explain [Taylor's] symptoms." *Id.* Thus, Taylor's case is not similar to Example 1.

The ALJ properly found that Taylor experienced medical improvement such that his spinal impairment no longer met Listing 1.04A. Further, because Taylor's impairment improved to the extent that it no longer met a listing, the medical improvement is related to his ability to work. *See* 20 C.F.R. § 404.1594(c)(3)(i).

### IV.B. Medical Opinion Evidence

Taylor next argues that the ALJ erred by failing to accord adequate weight to the opinion of his treating surgeon, Dr. Buchowski, in determining his residual functional capacity ("RFC"). Taylor also contends that the ALJ did not comply with 20 C.F.R. § 404.1527 in evaluating Dr. Buchowski's opinion.

> The ALJ made the following determination regarding Taylor's RFC:
>
> As of December 31, 2011, the impairments present at the time of the CPD had decreased in medical severity to the point where the claimant had the residual functional capacity to lift up to 20 pounds occasionally, sit for seven hours out of an eight-hour work day, and stand or walk for one hour out of an eight-hour work day. The claimant is unable to climb ladders, ropes, or scaffolds, as well as kneel, crouch or crawl. The claimant can occasionally climb ramps or stairs and can occasionally stoop. The claimant is unable to operate foot control operations. The claimant must avoid all exposure to extreme vibration, operational control of moving machinery, working at unprotected heights, and the use of hazardous machinery.

(Tr. 28.)

Social Security regulations require the ALJ to consider medical source opinions when assessing a disability claimant's RFC. *See* 20 C.F.R § 404.1527(b). Medical source opinions are statements from physicians, psychologists, or other acceptable medical sources that reflect judgments about the nature and severity of the claimant's impairments. *See* 20 C.F.R. § 404.1527(a)(2). If a treating source medical opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, it will be afforded "controlling weight." 20 C.F.R. § 404.1527(c)(2). However, such an opinion is not automatically controlling. *Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010) (treating source opinion "does not automatically control in the face of other credible evidence on the record that detracts from that opinion" (internal quotation marks omitted)). An ALJ may discount the opinion of a treating physician if it is inconsistent with the physician's clinical treatment notes. *Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010) (citing *Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009)). It is also permissible for an ALJ to discount a treating physician's opinion that is inconsistent with the record as a whole. *See id.* at 931 (citing *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.")). "When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so." *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (citation omitted).

The ALJ discussed the questionnaire Dr. Buchowski completed on July 7, 2011, in which he expressed the opinion that Taylor was unable to stand, walk, or sit for extended periods of time. (Tr. 27, 301.) The ALJ assigned "little weight" to this opinion, because the opinion was not supported by the medical record. (Tr. 27.) As previously discussed, Dr. Buchowski's own treatment notes reveal that Taylor had normal motor strength throughout the lower extremities,

normal sensation, normal reflexes, and negative straight-leg raising test. In fact, in January 2012, after Dr. Buchowski authored his opinion, Dr. Buchowski stated that Taylor's lower extremity radicular symptoms and low back pain had "resolved." (Tr. 407.)

The ALJ also discussed the opinion of consulting orthopedist Dr. Tate. (Tr. 27.) Dr. Tate expressed the opinion that Taylor was limited from standing or walking for more than one hour at a time, for a total of three hours per day; lifting more than twenty pounds; repetitive bending at the waist; and he should avoid heights, stairs, and ladders. (Tr. 306-07.) The ALJ assigned "great weight" to Dr. Tate's opinion, because he found it was consistent with the medical evidence of record. (Tr. 27-28.) Dr. Tate's opinion is consistent with her examination of Taylor, in which she noted Tylor had 4/5 strength in the upper and lower extremities, a slight decrease in his lumbosacral range of motion, and negative straight-leg raising. (Tr. 306.) Dr. Tate's opinion is also consistent with the treatment notes of Dr. Buchowski, in which he noted minimal findings on examination. The ALJ indicated that Dr. Tate's opinion was the basis of the RFC he formulated. (Tr. 28.)

The undersigned finds that the ALJ properly resolved conflict among Taylor's treating and examining physicians under 20 C.F.R. § 404.1527 in determining Taylor's RFC. Because Dr. Buchowski's opinion is controverted by other substantial evidence, including his own treatment notes, the ALJ properly discounted his opinion. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the evidence of record as a whole, the more weight we will give to that opinion"); *Halverson*, 600 F.3d at 930. Significantly, Dr. Buchowski found that Taylor's lower extremity radicular symptoms and low back pain had "resolved" by January 2012. (Tr. 407.) Thus, the ALJ articulated good reasons for not assigning controlling weight to Dr. Buchowski's July 2011 opinion in assessing Taylor's RFC. The RFC formulated by the ALJ is

supported by substantial evidence in the record as a whole.

After determining Taylor's RFC, the ALJ found that Taylor could not perform his past relevant work as a carpenter. (Tr. 30.) The ALJ found, based on the testimony of a vocational expert, that Taylor could perform other work as a telemarketer, cashier, and small products assembler. (Tr. 30-31.) Thus, the ALJ's decision finding Taylor no longer disabled is supported by substantial evidence. *See Buckner v. Astrue*, 646 F.3d 549, 560-61 (8th Cir. 2011) ("A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments").

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

*/s/ Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of September, 2015.